

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 2:19-cr-194 |
| | ) | |
| v. | ) | JUDGE Corker & Wyrick |
| | ) | |
| MISTY DAWN HOLLOWAY, | ) | |
| a/k/a Misti Hurst-Holloway, | ) | |
| a/k/a Misti A. Hollaway, | ) | |
| a/k/a Misty Dawn Laton | ) | |
| a/k/a Misty Hodges, | ) | |
| a/k/a Misty Dawn Bacon | ) | |
| a/k/a Misty Dawn Hollaway-Venett, | ) | |
| a/k/a Misty Venett Bacon, | ) | |
| a/k/a Misty Dawn Hurst | ) | |
| a/k/a Misty Dawn Hodges | ) | |

## PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of

Tennessee, and the defendant, Misty Dawn Holloway, a/k/a Misti Hurst-Holloway, a/k/a Misti A.

Hollaway, a/k/a Misty Dawn Laton, a/k/a Misty Hodges, a/k/a Misty Dawn Bacon, a/k/a Misty

Dawn Hollaway-Venett, a/k/a Misty Venett Bacon, a/k/a Misty Dawn Hurst, a/k/a Misty Dawn

Hodges, and the defendant's attorney, Nikki Peirce, Esquire, have agreed upon the following:

1.      The defendant will waive indictment and arraignment and plead guilty to an

information charging the defendant with the following offenses:

a)      Wire fraud in violation of 18 U.S.C. § 1347.  The punishment for this offense

is imprisonment of not more than twenty years, a fine of not more than $250,000, or both

imprisonment and fine, a term of supervised release of not more than three years, and a mandatory

special assessment of $100.

b)      Health care fraud in violation of 18 U.S.C. § 1347.  The punishment for this offense is imprisonment of not more than ten years, a fine of not more than $250,000, or both imprisonment and fine, a term of supervised release of not more than three years, and a mandatory special assessment of $100.

c)      Using another person's means of identification with intent to commit Federal offenses and state felonies and obtaining $1,000 or more during any one year period in violation of 18 U.S.C. §§ 1028(a)(7) and 1028(b)(1)(D).  The punishment for this offense is imprisonment of not more than fifteen years, a fine of not more than $250,000, or both imprisonment and fine, a term of supervised release of not more than three years, and a mandatory special assessment of $100.

2.      The United States also agrees not to further prosecute the defendant in the Eastern District of Tennessee for any other non-tax criminal offenses committed by the defendant related to the charges contained in this information.

3.      The defendant has read the information, discussed the charges and possible defenses with defense counsel, and understands the crimes charged.  Specifically, the elements of the offenses are as follows:

**Wire Fraud in Violation of 18 U.S.C. § 1343:**

First, the defendant devised and knowingly participated in a scheme to defraud in order to obtain money or property, that is, falsely holding herself out to have a college degree in nursing and representing herself to be a licensed, registered nurse in the state of Tennessee by using partial names and issued Tennessee registered-nurse licenses of other persons without their permission, consent, or authority in order to obtain employment with health care providers in the Eastern District of Tennessee.

Second, the scheme included a material misrepresentation or concealment of a material fact.

2

Third, the defendant had the intent to defraud.

Fourth, the defendant used wire, radio or television communications or caused another to use wire, radio or television communications in interstate commerce in furtherance of the scheme.

### Health Care Fraud in Violation of 18 U.S.C. § 1347:

First, the defendant knowingly and willfully executed or attempted to execute a scheme to defraud any health care benefit program.

Second, the scheme included a material misrepresentation or concealment of a material fact.

Third, the defendant had the intent to defraud.

### Obtaining $1,000 or More by Using Another Person's Means of Identification to Commit Federal Offenses or State Felony Offenses in Violation of 18 U.S.C. §§ 1028(a)(7) and 1028(b)(1)(D):

First, the defendant knowingly possessed or used a means of identification of another person.

Second, the defendant did so without lawful authority.

Third, the defendant possessed or used the means of identification in connection with any Federal offenses, that is, wire fraud (18 U.S.C. § 1342) and health care fraud (18 U.S.C. § 1347), or any state felony offense, that is, the Tennessee felony of the unauthorized practice of a licensed profession (Tenn. Code Ann. § 39-16-302).

Fourth, the possession or use of the means of identification of another person was in or affected interstate commerce.

Fifth, the defendant obtained $1,000 or more within any one year period as a result of committing the offense.

4.      In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements.  These are the facts submitted for purposes of the defendant's guilty plea.  They do not necessarily constitute all of the facts in the case.  Other

3

facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

### Defendant's Background and Lack of Qualifications as a Registered Nurse

Defendant is a lifelong resident of Eastern Tennessee. On January 28, 2003, she was convicted of the federal offense of theft or embezzlement by a bank employee, a felony offense under 18 U.S.C. § 656. Although defendant completed her Federal sentence that included a five-year period of supervision, at all times relevant to the information, she remained a convicted felon.

Defendant once attended Walters State Community College between 2005 and 2006 and earned 21 hours of credit toward a degree in office administration. Defendant never obtained a nursing degree from Walters State College. Defendant likewise never obtained a nursing degree from Carson Newman University or any other college or university in the state of Tennessee or elsewhere. Defendant similarly never graduated from a registered-nurse-pre-licensure program approved by the Tennessee Board of Nursing.

The National Council Licensure Examination (NCLEX) is a nationwide examination developed by the National Council of State Boards of Nursing for the licensing of nurses. The NCLEX takes two forms, the NCLEX-RN for those seeking to be registered nurses and the NCLEX-PN for those seeking to be licensed practical nurses. Defendant never took either exam and necessarily does not have the passing score necessary to be a registered nurse in the state of Tennessee. Defendant has never taken any other state-administered examination to become a registered nurse anywhere else.

To become a registered nurse in the state of Tennessee, an applicant must submit to a state and Federal fingerprint-based criminal background check. State or federal felony convictions are an absolute bar to licensure. Additionally, an applicant must possess a degree from an approved pre-

4

licensure program and must pass the NCLEX-RN examination. Defendant has never submitted an application to become a registered nurse, and defendant's federal felony conviction would be an absolute bar to her licensure as a registered nurse in the state of Tennessee. Her lack of the requisite education, training, and a passing score on the NCLEX-RN examination would also bar her from obtaining a registered nursing license in the state of Tennessee, and the lack of a license makes her practice of registered nursing unlawful.

At all times alleged in the information, therefore, defendant lacked the education, training, passing scores, and character requirements to be licensed as a registered nurse in the state of Tennessee, and she never was.

### The Scheme

At some point prior to September 27, 2012, defendant developed a scheme to obtain employment as a registered nurse, even though she did not have a registered-nurse license. Under her scheme, defendant falsely claimed to health care providers that she held a nursing degree from Walters State College (and, in some cases, Carson Newman University) when she did not. She also held herself out to potential health care employers as a registered nurse with an issued registered-nurse license from the Tennessee Department of Health, when she did not have that license. To bolster her misrepresentations, defendant obtained the names and license numbers of real registered nurses who had the same or similar partial names as the defendant. Defendant would then use these nurses' partial names and their Tennessee registered-nurse license numbers to seek and apply for employment that required a registered-nurse license. When questioned about why the name associated with the registered-nurse license was different from defendant's identification documents, defendant usually would tell potential employers that she had changed her name by

5

marriage or provide some other false reason for why her last name did not match the name on the nursing license she was using.

### Nurse Victims

Defendant used the partial names and the Tennessee registered-nurse license numbers of two registered nurses. The names and Tennessee registered-nurse license numbers issued to these real nurses are important means of identification for each of them. The registered-nurse license number, moreover, is a prerequisite for both of them to work as registered nurses in the state of Tennessee.

The first registered nurse victim has the initials M.A.H. She holds a nursing degree from Walters State College, is licensed as a registered nurse in the state of Tennessee, and has been licensed in this state since June 20, 2000. As part of her licensure, the Tennessee Department of Health issued her a unique registered-nurse license number consisting of a unique set of characters. M.A.H. resides in the Eastern District of Tennessee, and M.A.H. has never given the defendant permission, consent, or authority to use parts of M.A.H.'s name or to use M.A.H.'s Tennessee registered-nurse license number.

The second registered nurse victim has the initials M.D.V. She is licensed as a registered nurse in the state of Tennessee and has held her license since July 15, 2002. As part of her licensure, the Tennessee Department of Health issued her a unique registered-nurse license number consisting of a unique set of characters. M.D.V. resides in the Eastern District of Tennessee. M.D.V. has never given the defendant permission, consent, or authority to use portions of M.D.V.'s name or to use M.D.V.'s Tennessee registered-nurse license number.

### Health Care Provider Victims

During the duration of her scheme, defendant knowingly, willfully, and intentionally defrauded multiple health care providers in Eastern Tennessee by posing as a registered nurse when

6

she was not. Between September 2012 and November 2018, defendant used M.A.H.'s or M.D.V.'s registered-nurse license numbers and parts of their names to obtain employment as a registered nurse with these providers. Business records show that during this period, defendant worked as a purported registered nurse in diverse medical settings, including nursing homes, rehabilitation and assisted living facilities, a doctor's office, and as an in-home care nurse for shut-in patients. The following health care providers are known victims of defendant's scheme: Premier Support Services, d/b/a Interim Home Healthcare and Interim Health Care of East Tennessee; Jefferson Operator, LLC d/b/a Jefferson City Health and Rehabilitation Center; Hillcrest Healthcare Communities, Inc. d/b/a Grace Healthcare and d/b/a Beverly Park Place; Dr. Harry A. Zain d/b/a Five Rivers OBGYN; Camellia Home Health of East Tennessee d/b/a Camellia Home Health; Almost Family, Inc. d/b/a Suncrest Home Health; Life Care Centers of America d/b/a Life Care of Jefferson City; and Amedisys Holding, LLC.

Often, in an effort to obtain employment with these health care providers, defendant would submit on-line or written employment applications that reflected one or more of the following material falsehoods: (1) defendant had earned a nursing degree from Walters State College or some other university; or (2) defendant held a valid license as a registered nurse issued by the Tennessee Department of Health. As part of the pre-employment screening process, most of these health care providers routinely used interstate wire transmissions with verification agencies located in other states to conduct background checks or, in some cases, conducted their own verifications by accessing computers located in other states by wire transmissions.

The health care providers who hired defendant as a registered nurse would never have done so if they had known the true state of affairs. Once the health care providers hired defendant, she

7

received professional access to patients, administered invasive physical care and medications to patients, and received access to patients' sensitive, private, and confidential medical records.

Once health care providers hired defendant, the health care providers, at a minimum, paid the defendant a salary and paid the employer's portion of payroll taxes associated with defendant's employment. Some of the health care providers provided additional pre-tax benefits like health insurance. None of the health care providers would have paid anything to, or on account of, the defendant, if they had known that defendant was not a registered nurse. They never would have hired her.

In addition to direct payments to, or on account of, the defendant, some health care providers also billed patients and/or health care benefit programs like Medicare, Medicaid, and private insurers for defendant's registered nursing services. The bills sought compensation for work performed by a licensed, registered nurse and were based on descriptions of services defendant had performed and that defendant provided to her employers. Upon learning about defendant's true status, several of the health care providers refunded health care benefit programs substantial sums they had received for defendant's registered nurse services.

### Patients

Once defendant obtained a registered nurse position with the various health care providers, she began rendering actual medical care to patients, began dispensing medications to patients, and obtained invasive access to patients and their sensitive medical information. Because she lacked the formal training, education, and qualifications of a true registered nurse, defendant created a risk of serious bodily injury and, in some circumstances, even death to patients—often suffering or recovering from serious medical conditions. The dangers included defendant performing procedures she was not qualified to perform, letting needed procedures go unperformed because she recognized

8

her lack of qualifications to perform them, failing to properly document and update patient charts with the types of information that a real registered nurse would note, and, in some cases, falsifying medical records. In addition, patients often relayed sensitive, private, and confidential medical and personal information to defendant because they thought she was a real registered nurse and had no reason to question her status. Patients also provided defendant with unfettered access to their bodies based on the position of trust they believed she occupied and the special skills they believed she possessed.

The health risk defendant posed to patients was more than hypothetical. For example, one of defendant's patients whose initials are C.H. lived in Morristown, Tennessee. C.H. suffered from pancreatitis, had been hospitalized, and in March 2013, C.H. had returned home. At the time, defendant was working for a home health agency as a purported registered nurse. As part of her job, defendant treated C.H. for one day on March 16, 2013. On March 17, 2013, C.H. returned to the the hospital for hypoglycemia almost immediately after discharge secondary to insulin administration through a feeding apparatus, where C.H. received a 10-fold grater amount than was prescribed. C.H. had to be readmitted to the hospital for treatment by true medical professionals. C.H. remained hospitalized for three days as a result.

In another instance, on June 14, 2014, an employing health care provider documented in their records that defendant falsified patient medical records by recording multiple patients' blood sugar levels in their charts, when defendant had never checked those levels. According to the health care provider, this caused potential harm to patients.

Another example took place in September 2018. This time, a health care provider documented that defendant failed to properly chart a patient's wounds with correct wound care orders. This resulted in appropriate wound care not being completed during a skilled nursing visit and necessitated another nursing visit to correct the situation.

9

Similarly, on September 28, 2018, defendant failed to update a patient's medication list during a skilled nursing visit, and the problem was discovered by an alternate clinician. The above illustrations are those documented by business records.

**Fraudulent Health Care Submissions**

Often, as part of her duties when working as a registered nurse, defendant would complete or cause the completion of forms to be submitted to public and private health care benefit programs like Medicare, Medicaid, and private insurance companies. One example of these forms is a document called an Outcome and Assessment Information Set ("OASIS"). An OASIS assessment is administered to Medicare and Medicaid patients upon initial admission, discharge, transfer, and change in condition. In the context of home healthcare, an initial OASIS assessment is needed to authorize payment for an initial 60 days of home healthcare. The OASIS assessment is performed in person by a registered nurse, a physician, or a physician's assistant. The forms defendant would prepare and submit routinely contained the material misrepresentation that the submitted information was supplied or reviewed by a registered nurse. Although defendant was not a direct beneficiary of the payments her employers received after submitting the fraudulent forms, defendant knew that the forms she completed would be submitted in support of claims for reimbursement from health care benefit programs and would otherwise be used to cause payments to be made from these programs. Often, the defendant would fill in the section of the form that indicated what health care benefit program was the source of payment for the patient's care.

**Facts Pertaining to Count One – Wire Fraud**

On or about September 12, 2012, defendant submitted a hand-written application for a position as a registered nurse with Premier Support Services, Inc. d/b/a Interim Healthcare or Interim Health Care of East Tennessee ("Interim") in Morristown, Tennessee. On the application,

defendant falsely stated that she had never been convicted of a felony, falsely stated that she had never been convicted of "an offense involving dishonesty or breach of trust or fraud," and falsely claimed that she held an associate's degree in nursing from Walters State College. On a hand-written supplement to the application, defendant falsely used M.A.H.'s name as her own name. Defendant likewise falsely stated that she held a Tennessee license as a registered nurse and provided M.A.H.'s unique Tennessee registered-nurse license number as her own license number.

Interim hired defendant, and she worked for Interim until May 10, 2013. Interim would have never hired defendant if Interim had known that she was not a registered nurse. According to her issued W-2 tax forms, Interim paid defendant $14,989.33 in 2012 and $17,503.39 in 2013 for her work as a purported registered nurse.

Following her employment with Interim, defendant continued her scheme with Jefferson City Operation, LLC d/b/a Jefferson City Health and Rehabilitation Center ("JHRC"). On May 30, 2013, defendant submitted a hand-written employment application to JHRC. In this application, defendant claimed she was a registered nurse and used the first and middle name of M.A.H. Defendant again falsely claimed that she was a registered nurse in Tennessee, falsely claimed that she held a nursing degree from Walters State College, and falsely claimed that she had never been convicted of any criminal offenses.

JHRC hired defendant, and she worked for JHRC until June 14, 2014, when JHRC discovered that she had falsified medical records of patients. According to her issued W-2 tax forms, JHRC paid defendant $22,390.19 in 2013 and $16,070.93 in 2014. JHRC never would have hired defendant as a registered nurse if JHRC had known that she was not a registered nurse.

Following her employment with JHRC, defendant continued her scheme with Hillcrest Healthcare Communities, Inc. d/b/a Grace Healthcare and d/b/a Beverly Park Place ("Grace") in

11

Knoxville, Tennessee. On February 15, 2015, defendant submitted a typed application for employment as a registered nurse. On the application, defendant falsely claimed that she previously had used M.D.V.'s last name.

Defendant, as part of her application process with Grace, acknowledged in writing that Grace would conduct a background check using a company named Edge Information Management Incorporated ("Edge") located in Melbourne, Florida. Grace did, in fact, use Edge to conduct a background check on defendant, and Edge transmitted a background report about defendant to Grace by wire communication from Florida to Tennessee on March 3, 2015.

Grace hired defendant, and she worked for Grace from March 16, 2015, until November 2, 2015. During the initial period of her employment with Grace, defendant worked as a shift nurse. She later was promoted to shift manager. According to her issued W-2 tax form, Grace paid defendant $30,742.46 in 2015. Grace would have never hired defendant as a registered nurse if Grace had known that she was not a registered nurse.

Following her employment with Grace, defendant continued her scheme by obtaining employment with Dr. Harry A. Zain, d/b/a Five Rivers OBGYN ("Five Rivers") on November 9, 2015. Although Five Rivers' records include no written application, defendant held herself out as being a registered nurse. Defendant worked as a registered nurse for Five Rivers until May 22, 2016. According to her issued W-2 tax form, Five Rivers paid defendant $1,994.58 in 2015 and $9,303.90 in 2016 for her work as a purported registered nurse. Five Rivers would have never hired defendant as a registered nurse if Five Rivers had known that she was not a registered nurse.

Following her employment with Five Rivers, defendant continued her scheme with Camellia Home Health of East Tennessee ("Camellia"). On June 8, 2016, defendant submitted a hand-written employment application to Camellia. On the application, defendant falsely indicated that her prior

last name was M.D.V.'s last name. On the application, defendant falsely claimed that she held an "RN" license and provided M.D.V.'s license number.

Camellia hired defendant, and she worked for Camellia from the summer of 2016 through February 2017. According to her issued W-2 tax forms, Camellia paid defendant $24,575.57 in salary and benefits in 2016 and $3,520 in salary and benefits in 2017. Camellia would have never hired the defendant as a registered nurse if Camellia had known that she was not a registered nurse.

After working for Camellia, on February 26, 2017, defendant submitted a written application for employment as a registered nurse with Almost Family, Inc. d/b/a Suncrest Home Health ("Suncrest"). On the application, defendant falsely indicated that she had graduated from Walters State College and that she held a valid registered nurse license. Defendant fraudulently provided M.D.V.'s registered-nurse license number. Suncrest obtained a background check based on the information defendant provided on her application and subsequently hired defendant. On July 17, 2017, Suncrest terminated defendant for abandoning her job.

According to her issued W-2 tax form, Suncrest paid defendant $10,895.02 in 2017 for her work as a purported registered nurse. Suncrest never would have hired defendant as a registered nurse if Suncrest had known that she was not a registered nurse.

After Suncrest's termination, on July 25, 2017, defendant submitted an application to work for Life Care Centers of America ("LCCA"). The facts pertaining to defendant's employment with this health care provider are fully outlined below and form the factual basis for count three of the information.

After working for LCCA, on October 5, 2017, defendant submitted a typewritten application to Amedisys Holding, LLC. ("Amedisys") for the position of RN/PRN. On the application, defendant falsely used the first and last name of M.D.V. as defendant's first and middle name.

13

Defendant had previously submitted an online profile with a web-based employment company, Indeed. That company maintains no offices in the state of Tennessee. On her completed on-line profile, defendant falsely claimed that she graduated from Carson Newman University with a nursing degree, falsely claimed that she graduated from Walters State College with a nursing degree, and falsely claimed that she held a valid license as a registered nurse. Defendant provided M.D.V.'s unique Tennessee registered-nurse license number as defendant's own.

Amedisys hired defendant as a registered nurse on October 30, 2017. One of the documents defendant provided to Amedisys included a birth certificate that had been altered to reflect that defendant's father had the same last name as M.D.V. Defendant worked as a registered nurse until November 9, 2018, when Amedisys terminated her. The termination resulted when Amedisys received an anonymous tip that defendant was not a real nurse, researched the matter, and confirmed that defendant was not, in fact, a licensed, registered nurse.

According to her issued W-2 tax forms, Amedisys paid defendant $5,419.78 in 2017 and $42,199.45 in 2018 for her work as a purported registered nurse. Amedisys never would have hired defendant as a registered nurse if Amedisys had known that she was not a registered nurse.

### Facts Pertaining to Count Two – Health Care Fraud

In addition to her scheme to defraud healthcare providers of money through paid salary, wages, and other benefits, defendant also executed a scheme to defraud healthcare benefit programs of money by issuing forms and completing certifications as a registered nurse when she was not a registered nurse. For instance, while working for Amedisys and other health care providers, defendant often completed forms or caused others to complete forms that would be submitted to healthcare benefit programs such as Medicare, Medicaid, and private insurance companies. These forms would

14

document nursing activities and assessments that ultimately would result in payments from health benefit programs to the health care providers who employed defendant.

An example of the types of forms that defendant would submit included completed OASIS assessments. An OASIS assessment is administered to Medicare and Medicaid patients upon initial admission, discharge, transfer, and change in condition. The form is a lengthy data set based on a health professional's personal observations of a patient, includes lengthy medical history and condition information, and includes a certification that triggers a right to reimbursement from the health benefit program. An OASIS assessment is completed by a physician, a physician's assistant, or a registered nurse. In the context of home healthcare, an OASIS assessment is needed to authorize a 60-day period of home health care skilled nursing reimbursement.

S.H.E. was one of the patients defendant saw as a purported registered nurse. S.H.E. was a resident of Del Rio, Tennessee, and S.H.E. had recently returned home from the hospital following a hip surgery. Between September 15, 2018, and September 18, 2018, defendant administered an OASIS assessment to S.H.E. Defendant completed S.H.E.'s OASIS assessment as "Misty Bacon RN." The form documented 1.84 hours of defendant's time as a registered nurse for travel and conducting the assessment. The form generally documented S.H.E.'s overall health and medical condition and certified a need for future skilled nursing, physical therapy, and occupational therapy. In the form, defendant certified the following:

**BASED ON THE BELOW FINDINGS, I CERTIFY THAT THIS PATIENT IS CONFINED TO THE HOME AND NEEDS INTERMITTENT SKILLED NURSING, PHYSICAL THERAPY, AND OR SPEECH THERAPY. THE PATIENT IS UNDER MY CARE AND I HAVE INITIATED THE ESTABLISHMENT OF THE PLAN OF CARE FOR HOME HEALTH.**

Defendant knew that the information she gathered and the diagnosis she provided would be used to bill Medicare for skilled nursing services provided to S.H.E. One question of the form outlined financial arrangements for S.H.E.'s skilled nursing. The form, completed by defendant, noted the following financial arrangements:

15

**FINANCIAL**

**(C1) (M0150) CURRENT PAYMENT SOURCES FOR HOME CARE: (MARK ALL THAT APPLY.)**
**2 - MEDICARE (HMO/MANAGED CARE/ADVANTAGE PLAN)**

After completing S.H.E.'s assessment, defendant electronically signed the assessment as follows:

**Agent Signature:**

MISTY BACON RN  09/18/2018 08:35 AM
(Electronically Signed)

Without defendant falsely claiming that she was a registered nurse, the form would have been invalid.

While working for Amedisys, defendant completed, certified, and executed over 170 similar patient assessments. Upon learning that defendant was not really a registered nurse, Amedisys reimbursed (or recognized its reimbursement obligation) to health benefit programs in the amount of $487,652.00.

In a similar vein, Camellia also recognized that it had billed Tenncare (the Tennessee health benefit program that administers, among other things, Medicaid funds) for defendant's services while defendant worked as a purported registered nurse for Camellia. In that regard, Camellia reimbursed Tenncare the sum of $41,192.16 for purported registered-nurse services and actions that were provided by someone who was not a registered nurse.

### Facts Pertaining to Count Three – Obtaining $1,000 or More by Using Another Person's Means of Identification to Commit Federal Offenses or State Felony Offenses

On July 25, 2017, defendant submitted a hand-written application to work for Life Care Centers of America ("LCCA") at the Life Care Center in Jefferson City, Tennessee. On the

16

application, defendant indicated that she had used M.D.V.'s last name as a different name within the past five years. Defendant also falsely indicated that she held an associate's degree in nursing from Walters State College and that she held a bachelor's degree in nursing from Carson Newman University. Defendant falsely stated that she held an "RN" license and included M.D.V.'s unique Tennessee registered-nurse license number, a means of identification that had been issued to M.D.V. by the Tennessee Department of Health. Defendant also completed and signed a criminal history questionnaire in which she falsely indicated that she had never "been convicted of any criminal violation of the law other than a minor traffic violation."

Prior to defendant submitting this hand-written application to LCCA, M.D.V. had never given defendant permission, consent, or authorization to use M.D.V.'s last name or her registered-nurse license number issued by the Tennessee Department of Health.

At the time of applying to, and then while working for, LCCA, defendant used M.D.V.'s means of identification to commit and attempt to commit wire fraud in violation of 18 U.S.C. § 1343 (as detailed above), to commit and attempt to commit health care fraud in violation of 18 U.S.C. § 1347 (as outlined above), and to commit the Tennessee felony of unauthorized practice of a licensed profession in violation of Tenn. Code Ann. § 39-16-302.

Defendant's use of M.D.V.'s means of identification was in or affected interstate commerce. For example, LCCA is one of the largest privately-held, long-term elderly care companies in the United States, with facilities across 28 states. The company that did a background check on the defendant for LCCA is Sterling Talent solutions, a company that is headquartered in the state of New York.

As a result of defendant working for LCCA in 2017, according to defendant's issued W-2 tax form for 2017, LCCA paid defendant the amount of $7,629.57, a sum exceeding $1,000.

## Losses

Each of the health care providers paid substantial sums directly to, or on account of, defendant's employment with them as a purported registered nurse. The table below outlines the amount of money paid to defendant and the amount of any payroll taxes the employers paid on account of employing the defendant (*i.e.*, the employer-paid payroll taxes). The table below also depicts the amount of money that any of the health care providers actually reimbursed (or acknowledged liability to reimburse) to health benefit programs for services by defendant for which they billed and for which they actually reimbursed a health benefit program.[1]

| Health Care Provider | W-2 Income Paid to defendant | Employer-paid payroll taxes | Reimbursement to Health Benefit Programs |
|---|---|---|---|
| Premier Support Services, d/b/a Interim Home Healthcare and Interim Health Care of East Tennessee | $32,492.72 | $3,028.70 | |
| Jefferson Operator, LLC d/b/a Jefferson City Health and Rehabilitation Center | $38,461.12 | $2,942.48 | |
| Hillcrest Healthcare Communities, Inc. d/b/a Grace Healthcare and | $30,742.76 | $2,351.82 | |

---

[1] Defendant maintains that the amounts health care providers reimbursed health benefit programs is not an included component of loss. Defendant agrees, however, that the amounts set forth in the table above are accurate, and her only dispute concerns whether these losses are properly attributable to her under the United States Sentencing Guidelines.

18

| | | | |
|---|---|---|---|
| d/b/a Beverly Park Place | | | |
| Dr. Harry A. Zain, d/b/a Five Rivers OBGYN | $11,298.48 | $900.17 | |
| Camellia Home Health of East Tennessee d/b/a Camellia Home Health | $28,095.57 | $2,149.32 | $41,192.16 |
| Almost Family, Inc. d/b/a Suncrest Home Health | $10,895.02 | $833.46 | |
| Life Care Centers of America d/b/a Life Care of Jefferson City | $7,629.57 | $583.66 | |
| Amedisys Holding, LLC | $47,619.23 | $3,642.88 | $487,652.00 |
| **TOTALS** | **$207,234.47** | **$16,432.49** | **$528,844.16** |

**Interview of Defendant**

On January 22, 2019, an agent with the Tennessee Bureau of Investigation and a Detective with the Jefferson City Police Department conducted a non-custodial interview of defendant. During the interview, defendant advised, among other things, that she could not remember how she came up with the plan to work as a nurse, but did say that she came up with the plan on her own. Defendant said she did a random search on the Department of Health website with her first and middle name. The search pulled up the name of a victim nurse that had a current Tennessee license to be a registered nurse.

19

Defendant advised that she first applied as a registered nurse at Lakeway Hospital in Morristown, Tennessee in 2007. Defendant said that she told Lakeway that she had worked as a registered nurse in a factory, and her skills such as starting an I.V. would be lacking. Defendant explained that Lakeway provided all the training to her that got her up to speed. Defendant then admitted to working as a purported registered nurse for all the health care providers outlined above (with the exception of Five Rivers OBGYN) from the time she left Lakeway Hospital until her termination with Amedisys.

As part of this plea agreement, the defendant and the United States stipulate and agree that the specific offense characteristic provided by USSG §2B1.1(b)(2) does not apply to defendant's advisory guideline computation.

5.     The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

   a)     the right to be indicted by a grand jury for these crimes;

   b)     the right to plead not guilty;

   c)     the right to a speedy and public trial by jury;

   d)     the right to assistance of counsel at trial;

   e)     the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

   f)     the right to confront and cross-examine witnesses against the defendant;

   g)     the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

   h)     the right not to testify and to have that choice not used against the defendant.

6.     The parties agree that the appropriate disposition of this case would be the following as to each count:

a)     The Court may impose any lawful terms of imprisonment, any lawful fines, and any lawful terms of supervised release up to the statutory maximums;

b)     The Court will impose special assessment fees as required by law; and

c)     The Court may order forfeiture as applicable and restitution as appropriate. No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case.  Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty pleas.  The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties.  The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

7.     Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the Sentencing Guidelines.  Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, for the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines.  Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the

defendant's offenses, including violations of conditions of release or the commission of any additional offenses prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant not receive any reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

8.      The defendant agrees to pay the special assessment in this case prior to sentencing.

9.      Unless otherwise limited by an agreed preliminary order of forfeiture, the defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture as proceeds of the defendant's criminal activities which are in the possession or control of the defendant or the defendant's nominees for violations of 18 U.S.C. §§ 1343, 1347, 1028(a)(7) and 1028(b)(1)(D). The defendant agrees to forfeit a personal money judgment representing the proceeds in the amount of at least $207,234.47 that constitute or were derived from proceeds the defendant personally obtained, directly or indirectly, as a result of the violations. The defendant further agrees to assist the United States fully in the identification, recovery, and return to the United States of any other assets or portions thereof subject to forfeiture. The defendant further agrees to make a full and complete disclosure of all assets over which the defendant exercises control and those which are held or controlled by a nominee. The defendant agrees to forfeit all interests in the properties and to take whatever steps are necessary to pass clear title to the United States. These steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and the signing of any other documents necessary to effectuate such transfers. The defendant agrees not to object to any civil or criminal forfeiture brought against these properties. The defendant agrees to take all such steps to locate such property and to pass title to the United States before the defendant's sentencing.

22

10.     The defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for any loss caused to: (1) the victims of any offense charged in this case (including dismissed counts); and (2) the victims of any criminal activity that was part of the same course of conduct or common scheme or plan as the defendant's *charged* offenses. The defendant specifically agrees that the defendant's restitution obligation shall include the following:

- $35,521.42 payable to Premier Support Services, Inc. d/b/a Interim Home Health

- $41,403.60 payable to Jefferson Operator, LLC d/b/a Jefferson City Health and Rehabilitation Center

- $33,094.58 payable to Hillcrest Healthcare Communities, Inc. d/b/a Grace Healthcare and d/b/a Beverly Park Place

- $12,198.65 payable to Dr. Harry A. Zain, d/b/a Five Rivers OBGYN

- $71,437.05 payable to Camellia Home Health of East Tennessee d/b/a Camellia Home Health[2]

- $11,728.48 payable to Almost Family, Inc. d/b/a Suncrest Home Health

- $8,213.23 payable to Life Care Centers of America d/b/a Life Care of Jefferson City

- $538,914.11 payable to Amedisys Holding, LLC[3]

11.     Financial Obligations. The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any

---

[2] If the Court determines that this victim is not entitled to receive restitution for amounts it voluntarily repaid any healthcare benefit program, the restitution figure will be $30,244.89.

[3] If the Court determines that this victim is not entitled to receive restitution for amounts it voluntarily repaid any healthcare benefit program, the restitution figure will be $51,262.11.

time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying defendant's counsel and outside the presence of defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

a)      If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

b)      The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

c)      If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's Office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant.

12.     The defendant acknowledges that the principal benefits to the United States of a plea agreement include the conservation of limited government resources and bringing a certain end to the case. Accordingly, in consideration of the concessions made by the United States in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the offenses committed, the defendant voluntarily, knowingly, and intentionally agrees to the following:

a)     The defendant will not file a direct appeal of the defendant's convictions or sentence with one exception: The defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. The defendant also waives the right to appeal the Court's determination as to whether the defendant's sentence will be consecutive or partially concurrent to any other sentence.

b)     The defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack the defendant's convictions or sentence, with two exceptions: The defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

c)     The defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

13.     This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this plea agreement, the defendant will have the right to withdraw from this agreement. If the defendant

25

violates the terms of this plea agreement in any way (including but not limited to failing to enter guilty pleas as agreed herein, moving to withdraw guilty pleas after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty pleas in this case.

14.     The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

15.     This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charges, and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other

promises, representations, and statements whether made before, contemporaneous with, or after this

agreement, are null and void.

J. DOUGLAS OVERBEY
UNITED STATES ATTORNEY

_12/3/19_
Date

By: _____

Mac D. Heavener, III
Assistant United States Attorney

_12/2/19_
Date

Misty Dawn Holloway
a/k/a Misti Hurst-Holloway
a/k/a Misti A. Hollaway
a/k/a Misty Dawn Laton
a/k/a Misty Hodges
a/k/a Misty Dawn Bacon
a/k/a Misty Dawn Hollaway-Venett
a/k/a Misty Venett Bacon
a/k/a Misty Dawn Hurst
a/k/a Misty Dawn Hodges
Defendant

_12/2/19_
Date

Nikki Peirce
Attorney for the Defendant

27