UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 2:19-CR-194 |
| | ) JUDGE CORKER |
| MISTY DAWN JONES, | ) |
|     a/k/a Misti Hurst-Holloway, | ) |
|     a/k/a Misti A. Holloway, | ) |
|     a/k/a Misty Dawn Layton, | ) |
|     a/k/a Misty Hodges, | ) |
|     a/k/a Misty Dawn Bacon, | ) |
|     a/k/a Misty Dawn Hollaway-Venett, | ) |
|     a/k/a Misty Dawn Hurst, | ) |
|     a/k/a Misty Dawn Hodges, and | ) |
|     a/k/a Misty Dawn Holloway. | ) |

## AMENDED SENTENCING MEMORANDUM
## ANDREQUEST FOR DEPARTURE/VARIANCE

Misty Dawn Jones, by and through defense counsel, files this amended sentencing memorandum reflecting her position with respect to a sentence that is sufficient but not greater than necessary to achieve the sentencing purposes set forth in 18 U.S.C. § 3553(a). The Presentence Investigation Report establishes an advisory guidelines range of 57 to 71 months based on a total offense level of 24 and a criminal history category of II. Counsel has filed objections to the PSI Report that impact the advisory guidelines range calculations. As noted in the Addendum to the PSI Report, the government concedes the objection relative to criminal history, thereby lowering the Criminal History Category from II to I and the advisory guidelines range from 57 to 71 months to 51 to 63 months. Counsel urges the Court to grant this objection, as the lower Criminal History Category I is also the category the parties discussed being applicable when resolving the case through plea negotiations as well. Resolving this objection then leaves for the Court's consideration the objections to the loss calculation and restitution. The statutes for which Ms. Jones stands convicted are Class C felonies for which the statute also authorizes a range

of probation eligibility for not less than one nor more than five years' probation as noted in paragraph 110 of the PSI Report.

Several § 3553(a) sentencing factors will weigh into this Court's decision as to what sentence will be sufficient but not greater than necessary to achieve the § 3553(a) sentencing purposes. Counsel submits to the Court a variance is appropriate to address Ms. Jones' personal circumstances, to include the assistance she provides to her daughter in raising children with special needs as detailed in the Sealed Supplement, as well as the overreaching that results from holding Ms. Jones fully accountable for loss amounts that exceed amounts associated with her salary to include reimbursements by two employers to Medicare and TennCare beyond her individual nursing services, as well as the fact the 14-level offense level increase lumps Ms. Jones in the same category as other offenders with losses nearing $1.5 million. In short, the offense level increases are arbitrary and are not based on empirical studies demonstrating that such an offense level increase is commensurate with that necessary to achieve the § 3553(a) sentencing purposes. Counsel submits that the advisory guideline range should be no more than 27 to 33 months, based on a base offense level of 7, with these offense level increases only: loss amount of $150,000 to $250,000 - 10 levels; conscious risk of death or injury – 2 levels; abuse of position of trust/use of special skill – 2 levels; with the full 3-level reduction for acceptance of responsibility resulting in a total offense level of 18/Criminal History Category I/advisory guideline range of 27 to 33 months. It is this range from which a variance should be considered.

**I.      Procedural History**

On January 22, 2019, Ms. Jones fully admitted her crimes to an agent with the Tennessee Bureau of Investigation and a detective with the Jefferson City Police Department, acknowledging that she applied and worked as a nurse without a license. The sum of her admissions are detailed in the lengthy factual portion of the plea agreement she signed on December 2, 2019,

2

acknowledging fully her illegal conduct, and cannot be further explained beyond her admissions she made to the Court in support of her plea. On December 12, 2019, Ms. Jones pled guilty to the information charging her with wire fraud (18 U.S.C. § 1343), healthcare fraud (18 U.S.C. § 1347), and identity theft (18 U.S.C. § 1028(a)(7)). Significantly, Ms. Jones admitted her crimes in a manner that avoided the time and expense associated with grand jury indictment, relieving the government from presenting proof to a grand jury to establish her guilt for her crimes. Ms. Jones made these admissions promptly after being appointed counsel to assist her and forthwith entered her pleas of guilty before the Court within days of signing the plea agreement. As noted by the government, much of the delay in resolving the case was due to the need to employment records which necessitated the issuance of subpoenas under the ordinary course of business, not due to any delay Ms. Jones sought in resolving the matters. She has been nothing but cooperative with law enforcement, the government and with this Court. Her sentencing has been delayed not of her own making but due to the difficulties associated with the pandemic, and is currently set for sentencing on September 4, 2020, at 1:30 p.m. She has been fully compliant with pretrial release conditions while released on bond pending resolution of the case, and has been making significant strides in addressing issues that have contributed to the bad decisions she has made in her life.

## II. History and Characteristics of the Defendant

The Presentence Investigation Report accurately reflects the circumstances of the offense as summarized from Ms. Jones' admissions in the plea agreement and provides many details as to the characteristics of Ms. Jones, but falls short of fully detailing the life Ms. Jones has lived. Because much of this information is sensitive in nature and provides graphic details of events in her childhood and adult life, as well as her family, counsel files additional reasons in support as a sealed supplement and exhibits in support of the sentencing memorandum and request for variance. These matters are sensitive for Ms. Jones, and counsel asks that her privacy in this regard be

3

respected as well. Nonetheless, these details are important in understanding how Ms. Jones comes before the Court under these unique circumstances, actions for which Ms. Jones recognizes and regrets caused so much heartache and pain. Ms. Jones fully acknowledges the difficulty this has caused her victims and intends to do everything within her power to use the rest of the years of her life to help people in a positive, lawful way.

Ms. Jones is not in any way attempting to minimize or make excuses for the seriousness of her conduct that has brought her before this Court. Rather, she seeks to demonstrate that her conduct relating to the offenses stems from her wanting to care for her family and provide them with a better life. Ms. Jones requests the Court to consider her unique circumstances when fashioning an appropriate sentence. Ms. Jones is more than the sum of the crimes, and asks the Court to take these additional facts into consideration as provided under § 3553(a).

As described in the Presentence Report, significant life events are still hard for her to talk about to this day. She became pregnant with her first child at the age of 16. She had two additional children within the next 3 years. She obtained her Certified Nursing Assistant licensure in 1998 but quickly learned she could earn better wages at other employment, taking a job as a bank teller in December 1999. Though young, she and her husband made ends meet and provided a loving home for their children. However, Ms. Jones' world came crashing down when her husband and the father of her three children was killed on March 10, 2001. She was now a widow at the young age of 25.

In the midst of dealing with this devastating situation and bills mounting for a funeral she could not afford, Ms. Jones made a horrible decision on May 7, 2001, to take money from the bank, leading to the federal conviction for embezzling money. Ms. Jones had worked at the bank since December 1999, though not earning much as a teller. Ms. Jones was desperately trying to find a way to take care of her three children.

4

There are so many things Ms. Jones realizes she could have done differently. She never should have chosen to seek employment without credentials of her own and then follow that decision with more lies to cover up the initial fraud she committed to the point she was living a lie, though she did the right thing and divulged everything when approached by law enforcement. Ms. Jones fully acknowledges she took full advantage of the opportunity to use the real nurse's name and licensure number in applying for employment as a registered nurse. As the government has detailed in its sentencing memo, public health licensure numbers are readily available to the public, and thus, not much effort was needed to obtain this additional information to secure a job through the normal application process. Ms. Jones acknowledges this was a terrible decision, and one that she repeated as she moved to other jobs after realizing credentials were not closely checked and having good references and employee reviews to help with the transitions between jobs, During these years of working as a RN, she was liked by her employers, co-workers and patients and given promotions and for the most part outstanding referrals. She was described as: "skilled, responsible, efficient and sympathetic to the care of patients." Some of the nurses and staff that worked with Misty Jones could not believe the story was true when it came up on the news. They have stated, "I never seen her do anything that made me think she didn't know what she was doing." (See Sealed Exhibits and Supplement in Support – Employment). Ms. Jones grew to love the profession to which she acknowledges she caused much shame and truly saw herself as helping others despite her lack of credentials.

Her attitude of helping others carried over from her family responsibilities and caring attitude with friends and others. Ms. Jones' family and friends have written several letters in support of her and most all note what a caring and loving person she was and is. They describe her willingness to help everyone she meets regardless of what she is going through at the present time. She places the wants and needs of others before her own. (See Sealed Exhibits and Supplement in Support - Leniency Letters).

5

## II.  Nature of the Offense

Counsel does not dispute the seriousness of the charges, and Ms. Jones expresses remorse in her letter to the Court for her actions and gives thanks as well that no one was injured by her decision to work as a nurse without proper credentials and instead use those of others.  As noted by the government in its sentencing memorandum, relatively few cases are available for comparison.  Yet, among those cases factual differences exist, as the nurse *United States v Jada Necole Antoine*, No. 3:14-CR-307 (N.D. Texas) stole a real nurse's driver's license and social security card and then obtained employment using not only her licensure number but her photographic images, adding sophistication to the scheme such that a sentence of 48 months was imposed.  Yet, the government here asserts that the conduct for which Ms. Jones faces sentencing is deserving of a 60 months' sentence, despite later conceding the Criminal History Category should be lowered to Criminal History Category I.  Instead, the government maintains its initial recommendation to the Court rather than adjusting its recommendation within the lower advisory guideline range of 51 to 63 months.  Nonetheless, many of the points made by the government are already taken into account by the advisory guidelines range that applies.  For this reason, counsel urges the Court to likewise consider a lesser sentence.  Likewise, the government urges the Court to consider a higher sentence because it assesses a higher loss amount.  However, as noted below, reasons exist that this loss amount should be assessed at the lower 10-level increase rather than the 14-level increase.  As acknowledged by the government, a court has also granted probation for another who engaged in conduct similar to Ms. Jones, albeit for a shorter time frame.  *United States v. Samantha L. Rivera*, No. 4:17-CR-00208 (ED Mo. May 10, 2017).  *Rivera* is important as well, as it appears the losses were assessed for salaries only, which likely accounted for the lower loss figures.  Likewise, state courts have dismissed charges against a fake nurse and expunged the charges (https://www.wvlt.tv/2020/07/22/case-against-farragut-fake-nurse-dropped/) or found a

6

longer term of probation to be appropriate when a nurse's identity was used to obtain work at a nursing and rehabilitation center or veterinary. https://denver.cbslocal.com/2017/12/19/fake-nurse-sentenced-probation/; https://www.rcvs.org.uk/news-and-views/news/fake-veterinary-nurse-given-suspended-sentence/. As in these cases and in *Rivera*, counsel also urges the Court to look beyond the offenses and also look at the offender, as this factor is deserving of weight under § 3553(a) as well, as noted above.

Relative to the loss amount urged by the government as the most serious aggravator in this case, counsel notes there is significant unfairness in attempting to hold her accountable not only for losses associated to her salaries, but also amounts refunded to health care programs when more than just her nursing services were refunded. In *United States v Holly Marie Whyde*, No. 1:16-00044-JMS-TAB (S.D. Ind. July 15, 2016), the Court assessed no loss amount because of the difficulty in quantifying the specific loss and gave no offense level increase as a result, resulting in a guideline range of only 2 to 8 months, followed by 2 years for the identity theft. A sentence below that recommended by the government here was imposed – 30 months. The *Whyde* case is important as reimbursements to health care programs were not included in loss amounts or restitution. Nor should those amounts be included in the present case.

Reimbursements to Medicare and TennCare should not be included in loss amounts or restitution amounts for guideline calculation purposes because as acknowledged by the government, the services were medically necessary as they were provided at the direction of each patient's treating physician and these services were rendered only after a physician review for medical necessity by physician staff for both Camellia and Amedisys. Because of these refunds, the Presentence Report assesses a 14-level increase based on a conclusion the loss was more than $550,000 but less than $1,500,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(H), as opposed to the 10-level increase for her paid salaries falling within the range of more than $150,000 but less than $250,000.

7

Should the Court rule against counsel's arguments that these refund amounts should not be considered for loss calculation purposes, grounds exist for the granting of a variance should the Court assess a 14-level increase based on a conclusion the loss was more than $550,000 but less than $1,500,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H). Counsel has urged in the Objections to the PSI Report that the Court hold Ms. Jones accountable for the salaries paid to her and not the amounts reimbursed to Medicare and TennCare. Only a 10-level increase should have been assessed for the loss being more than $150,000 but less than $250,000. As noted in the plea agreement and summarized on page 15 of the PSI Report, footnote 1, "Defendant maintains that the amounts health care providers reimbursed health benefit programs is not an included component of loss. Defendant agrees, however, that the amounts set forth in the table above are accurate, and her only dispute concerns whether these losses are properly attributable to her under the United States Sentencing Guidelines."

Certainly, the case before the Court is a unique one. However, the Application Notes to U.S.S.G. § 2B1.1 provides guidance as to how the loss should be calculated. Loss under subsection (b)(1) is "the greater of actual loss or intended loss." "Actual Loss" means the reasonably foreseeable pecuniary harm that resulted from the offense, while "Intended Loss" means "(I) the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or likely to occur." (Emphasis added, as this language was most recently added by the 2015 Amendments to U.S.S.G. § 2B1.1). The reasons set forth by the United States Sentencing Commission make clear that sentencing enhancements predicated on intended loss, rather than losses that have actually accrued, should focus more specifically on the defendant's culpability. https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf. Here, the pecuniary harm the Defendant purposely sought to inflict was to obtain employment fraudulently from the listed health care providers. The collateral consequence to that harm was that the health care providers submitted

8

payments for services believing she had the appropriate credentials to perform the services for patients who suffered from ailments that qualified them for medical treatment and billing. However, at least for Amedisys, the reimbursements for patients to Medicare include not only Ms. Jones' services as a nurse but also the services of other departments within Amedisys without an appropriate accounting or dissecting of billing of her nursing skills separate from other departments. Regardless of the Medicare billing practice, it would not be fair to hold Ms. Jones accountable for services rendered by other departments when those services were in fact deemed medically necessary by not just the treating physician but also the staff physician for Amedisys.

The facts before the Court most closely assimilate an "Unlawful Misrepresentation Scheme" wherein Defendant misrepresented herself to be a nurse qualified for the positions for which she was paid over a period of time. U.S.S.G. § 2B1.1(3)(F)(v) provides the special rule for this situation to allow for the loss to be calculated from "the amount paid for the . . . services . . . with no credit provided for the value of those . . . services." This rule applies "[i]n a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons fraudulently posing as licensed professionals," as is the case before the Court. Using this special rule, only the salary losses should be used to calculate loss. Here, the income paid to Defendant, $207,234.47, as acknowledged by her in the plea agreement constitutes the actual loss resulting from the offenses to which she has pled guilty: wire fraud, health care fraud, and fraudulently using another's identity to obtain $1,000 or more. The amounts paid to her directly by the health care providers is the reasonably foreseeable pecuniary harm and also constitutes the intended loss, as the Defendant knew she was not entitled to the wages earned because she lacked the education and training required for the positions. Defendant acknowledges the 10-level increase is fully supported by this special rule given the total salary amounts of $207,234.47. That amount of a level increase is significant and is more than double the base offense level of 7.

9

Yet, the higher loss of more than $550,000 but less than $1,500,000 is sought to be attributed to her for loss purposes because two of the health care providers opted on their own to refund federally funded programs (Medicare/Medicaid and TennCare) amounts far in excess of the salaries the Defendant received without appropriately accounting only for the nursing services she provided. Without appropriate proof of this accounting, it would not be appropriate for loss or restitution purposes to hold her responsible for amounts that were not directly related to her nursing services, but that of others. As with the typical health care fraud cases, the government does not argue here that the patients for whom bills were submitted did not suffer from ailments which justified the payments being assessed, as the treating physician provided the initial orders for home health services and the home health physician provided final approval for submission of payments. In essence, the services provided to patients was <u>doctor approved</u> on the front end by the patient's treating physician, and <u>doctor reviewed</u> by the home health agency staff physician. Long and short, these services were medically necessary and simply because these agencies believed they were obligated to repay the amounts and a better accounting system could not sever her fraudulent nursing services, Ms. Jones should not be financially responsible for repayment or have her liberty taken for these additional amounts. These additional amounts ($41,192.16 refunded by Camellia Home Health) and ($487,652 refunded by Amedisys Holding, LLC) should not be included in either the loss or restitution amounts.

At least one of the health care providers, Amedisys, was motivated to return all funds received for cases involving care provided by the Defendant because Amedisys itself was complying with probationary directives for federal investigations into its own corporate operations. [https://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations#:~:text=Amedisys%20also%20agreed%20to%20be%20bound%20by%20the,to%20that%20which%20gave%20rise%20to%20the%20settlement](https://www.justice.gov/opa/pr/amedisys-home-health-companies-agree-pay-150-million-resolve-false-claims-act-allegations#:~:text=Amedisys%20also%20agreed%20to%20be%20bound%20by%20the,to%20that%20which%20gave%20rise%20to%20the%20settlement). Amedisys also provided letters to its

patients notifying them of the fraud that had occurred and inquiring if a physician review of the file was requested by the patient. Counsel understands from AUSA Mac Heavener that legal counsel for Amedisys informs that a very limited number of reviews were requested or conducted, supporting a determination the treatment was medically necessary, a point conceded by the government.

The Sixth Circuit has affirmed a district court's finding that loss should not be assessed when performance is satisfactory and something of value is received, distinguishing fraudulent services from circumstances similar to here. *United State v. Douglas*, 634 F.3d 852, 863 (6th Cir. 2011); *see e.g., United States v. Maurello*, 76 F.3d 1304, 1311-12 (3d Cir. 1996) ("A client who obtained a satisfactory contract, settlement, or verdict has received something of value, irrespective of whether the lawyer was licensed at the time."). Though Defendant worked for Amedisys for only a year and received a salary amount of $47,619.23, an amount nearly 10 times her salary ($487,652.00) is sought to be attributed to her as a loss for her conduct under the guidelines. Comparing that amount to Camellia Home Health's reimbursement to health benefit programs ($41,192.16) demonstrates the unreasonableness of the $487,652 amount as a loss for either guidelines or restitution purposes, especially when Defendant worked for both companies for about the same amount of time.

Should the government seek to support the higher loss amount by citing Application Note 2B1.1(3)(F)(viii), it must first address how the aggregate dollar amounts were for fraudulent bills, as this provision provides only that "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of intended loss, if not rebutted." Here, the procedures billed for were physician approved based on the legitimate ailments of the patients, and it is not suggested that billing was made for unnecessary procedures, as is often the case for health care fraud. Simply because a health care provider refunded monies to a federally

funded program should those amounts be used to calculate the loss or be used to assess restitution. Even looking to Camellia Home Health's reimbursement ($41,192.16) in relation to her salary ($28,095.57), this amount is significantly less than double her salary. Even if these reimbursement amounts can be properly assessed, and counsel does not concede this, there must be a significant adjustment to Amedisys' reimbursement as these amounts simply were not assessed for her nursing services alone and ultimately the services remained medically necessary, unlike the ordinary case for health care fraud cases. Furthermore, it simply cannot be ignored that the 14-level increase spans a loss amount of nearly a million dollars, though the amount of loss assessed falls closer to the bottom of that range, warranting consideration for a variance nonetheless.

The conduct involved in this case, though unique, reflect steps taken by the Defendant falsely representing herself as a nurse, though she did not have credentials of her own. The steps taken by the defendant in the present case cannot be said to be extremely elaborate. Merely because the scheme continued for a longer period of time without detection does not convert the scheme into an elaborate one. When confronted by law enforcement, the defendant fully and unequivocally acknowledged what she had done, explaining to Agent Richy Walker and Morristown Police Department Detective Eric Thomas that she decided to seek employment as a nurse following the death of her husband and trying to provide for three minor children on her own. Nor does the fact that the scheme brings to light a flaw in a regulatory system, which unquestionably needs to be changed and corrected. Rather, as a fraud goes, the conduct usually reveals a flaw in the system, whereas here photographic imaging should be connected to licensures as well as a means by which personal identifying information can be cross-checked. In this case, the defendant did a random search on the Department of Health website with her first and middle name, pulling up the name of a current Tennessee license to a registered nurse with a different last name, "MDV." A search of this kind can reveal the same information within minutes. She then used this name and applied as an RN. Her earlier hires at Lakeway Hospital in Morristown,

12

Tennessee, involved the use of another's diploma with the same first and last name[1]. The defendant used her own social security number in the application process, albeit using another middle name when hired at Lakeway and later using the name of "MDV" along with her licensure credentials.

The additional steps she took to defraud the employers into hiring her are steps that would be considered ordinary not elaborate for a fraud of this type. Lies and deceit are necessarily part and partial to a fraud being committed. Ms. Jones did not use the personal identifying information beyond obtaining employment. Once hired, she then began duties as a registered nurse following directions for duties learning specifics through on the job training and through additional training provided by the health care provider. Ms. Jones worked at Lakeway Hospital until 2012, and for other health care providers until Amedisys HR was notified in 2018 that she was not in fact a registered nurse. In the submission of forms relied upon for billing to insurers and public health programs, Ms. Jones completed documents and followed the procedures used by the heath care provider. Her actions relating to the application process itself were part of the fraudulent scheme itself, as there would otherwise be no other way to have committed the crimes for which she is being punished. She did not create a complex method of evading detection, and when approached by law enforcement readily admitted her conduct.

Because her employers and law enforcement did not uncover the scheme quickly speaks to these employer's satisfaction with the job done by Ms. Jones and the referrals received for new

---

[1] It should be noted that Ms. Bacon herself self-disclosed information to law enforcement that otherwise would not have been known, as the government acknowledges that it otherwise would have had no way to access employee files for this employer because it had long since closed its doors. As such, Ms. Bacon confirmed not only the end of the scheme but also established the beginning of the scheme, though her memory was not the best as to the specific dates. Notably, as well, the parties in reaching plea resolutions in the present case had always accounted for the lower Criminal History Category I. Nonetheless, Ms. Bacon's full and unequivocal acceptance of her wrongdoing likewise needs to be given full consideration as well, when considering the § 3553(a) sentencing factors and requests for a variance.

hires, which is demonstrated by her employee files, as recognized by the government in its sentencing memorandum. Her actions must be compared to the normal fraud of this type. *United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011). Unquestionably, there are fewer cases as noted above to compare the present case with given its uniqueness. Nonetheless, the Court must ask if the present case is more intricate than the normal fraud <u>of this type</u>

### III. The Sentence imposed needs to account for Ms. Jones' special role in assisting her daughter in caretaking of her grandchildren with special needs.

Ms. Jones is one of the caretakers for her grandson who has Cerebral Palsy, ICD, Epilepsy and a multitude of other conditions. (See Sealed Exhibits and Supplement in Support of Sentencing Memorandum and Request for Departure/Variance). Pursuant to U.S.S.G. § 5H1.6, the court can consider a downward departure based on the loss of caretaking and financial support of Ms. Jones's family. The commentary to U.S.S.G. § 5H1.6 states in relevant part:

"A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the present of the following circumstances:

> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
> (iv) The departure effectively will address the loss of caretaking or financial support.

14

Should the Court not agree that a guideline departure is necessary, the Court may also consider this when deciding if a variance from the calculated guidelines is warranted, and counsel urges the Court to do so.

As discussed above, Ms. Jones's grandson has serious medical conditions that require constant care. Ms. Jones went through training to be qualified in basis life support, advanced life support and pediatric life support to care for her grandson. This is medical knowledge Ms. Jones also applied in her day to day workings as a nurse, albeit without a license, as well as the on the job trainings and certifications provided by her employers. Ms. Jones's grandson and daughter depend on Ms. Jones to help care for them on a daily basis, as her daughter has no one else to provide relief for her given her additional responsibilities in caring for her other children. There is no person relatively comparable to Ms. Jones who could provide the same care to her grandson, as she has provided essential support to his mother since his birth. Sentencing Ms. Jones to a greater than necessary sentence would place an extraordinary burden on her daughter and grandson, and for this reason asks the Court consider these special circumstances in departing or varying from the guidelines to allow her to continue to be with her family or return her to them as soon as possible so that she can continue to assist in her grandson's care.

## IV.  Conclusion

In consideration of the foregoing, Ms. Jones respectfully submits that a sentence of no more than 27 to 33 months is sufficient but not greater than necessary to achieve the sentencing purposes set forth in 18 U.S.C. § 3553(a). A variance from this range is most appropriate with a longer term of supervision to allow Ms. Jones to continue the positive changes she has made to address her past and prepare for her future.

RESPECTFULLY SUBMITTED:

FEDERAL DEFENDER SERVICES OF
EASTERN TENNESSEE, INC.

BY: s/ *Nikki C. Pierce*
Nikki C. Pierce
BPR No. 018181
Federal Defender Services
219 West Depot Street, Suite 2
Greeneville, TN 37743
(423) 636-1301

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2020, a copy of the foregoing Sentencing Memorandum was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

s/ *Nikki C. Pierce*