UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 2:19-CR-00194-DCLC |
| | ) | |
| vs. | ) | |
| | ) | |
| MISTY DAWN JONES, | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Misty Dawn Jones's objections [Docs. 30, 34, 35] to the U.S. Probation Officer's Presentence Investigation Report (PSR) [Doc. 16]. The Court conducted an evidentiary hearing on the objections on September 4, 2020, where the Court received testimony from the parties regarding Defendant's objections. The matter is now ripe for resolution.

**I.    BACKGROUND**

On December 4, 2019, the Government filed an Information charging Defendant Misty Dawn Jones ("Defendant") with one count of wire fraud in violation of 18 U.S.C. § 1343, one count of health care fraud in violation of 18 U.S.C. § 1347, and one count of obtaining $1,000 or more by using another person's means of identification to commit federal or state felony offenses in violation of 18 U.S.C. §§ 1028(a)(7) and 1028(b)(l)(D) [Doc. 1]. Defendant entered a plea agreement and pled guilty to all three offenses [Docs. 2, 7].

Defendant did not have a nursing degree, was not licensed as a registered nurse, and because she was a convicted felon, she could not be licensed. But she convinced eight health care

1

providers that she was. She researched the names of registered nurses and found two who had a similar name as hers. She used those nurses' license numbers and lied to her potential employers that she had changed her name to explain the name discrepancy [Doc. 2, *Plea Agreement*, pg. 5-6].

She worked for eight different health care providers as a purported "registered nurse," having access to patient medical charts and was called upon to render actual medical care[1] [*Id.* at pg. 7-8]. These eight employers paid her a salary and her payroll taxes and billed health care benefit programs for the services Defendant had rendered. Defendant completed the forms to justify payment by the health care benefit programs for the services she provided and, on many occasions, falsely represented she had performed the services as a registered nurse[2] [*Id.* at pg. 10]. Further, she knew these forms would be used by her employer to justify payment from the health care benefit programs for the services rendered [*Id.*]. When her fraud was uncovered, two of her employers determined how much money they had received from the health care benefit programs that was tied to Defendant and paid them back. The others did not.

The U.S. Probation Officer disclosed the Presentence Investigation Report on March 12, 2020 [Doc. 16]. The Government did not object to the PSR [*see* Doc. 17]. Defendant filed ten

---

[1] Not surprising, it did not always go well for her patients. While working as a purported registered nurse, Defendant performed procedures she was not qualified to perform, let needed procedures go unperformed, failed to properly document and update patient charts, and falsified medical records [Doc. 2, *Plea Agreement*, pg. 8-9]. Defendant administered to one patient an amount of insulin ten times what was prescribed, resulting in the patient being readmitted to the hospital and remaining hospitalized for three days [*Id.* at pg. 9]. Defendant failed to properly chart another patient's wounds with correct wound care orders and failed to update a separate patient's medication list during a skilled nursing visit [*Id.* at pg. 9-10].

[2] One of these forms was the Outcome and Assessment Information Set (OASIS), which is an assessment administered to Medicare and Medicaid patients. Only a registered nurse, physician or physician's assistant may complete this form as it used to authorize payment for 60 days of home health care for the patient [Doc. 2, *Plea Agreement*, pg. 10]. Defendant falsely completed this form, representing herself as a register nurse [*Id.*].

objections [*see* Docs. 30, 34, 35]. The Government filed a response to Defendant's objections [Doc. 39], and the U.S. Probation Officer also responded to Defendant's objections [Doc. 51]. On September 4, 2020, the Court held an evidentiary hearing on Defendant's objections. At the hearing, the Court heard evidentiary testimony from Denise Bohnert, who is the Chief Compliance Officer for Amedisys, a registered nurse, and an attorney. The Court also received testimony unrelated to the objections. The Court heard allocution testimony on behalf of the Government from Tom Lane with the Tennessee Department of Health, Office of Investigations; David Kemmerly, Chief Legal Officer and Chief Government Affairs Officer for Amedisys; and Misty Dawn Vinette, one of the victims whose registered nursing license Defendant used. The Court heard allocution testimony on behalf of Defendant from Teresa Fletcher, Defendant's therapist. At the conclusion of the hearing, the Court took Defendant's objections under advisement.

## II. ANALYSIS

### A. The Loss Calculation – Defendant's objection to ¶ 68 of the PSR

Defendant has raised several objections to this loss calculation. The PSR calculated the loss to be $752,511.12 and applied a 14-level enhancement based on a loss being more $550,000 but less than $1,500,000 pursuant to U.S.S.G. § 2B1.1(b)(1)(H) [Doc. 16, ¶ 68]. This amount was comprised of her salary she received from each of the eight health care providers she worked for, the payroll taxes they paid on her behalf, and the repayments made by two of her prior employers that they attributed to her fraud [Doc. 2, *Plea Agreement*, pg. 18].

The Defendant agreed that "[e]ach of the health care providers paid substantial sums directly to, or on account of, defendant's employment as a purported registered nurse" [*Id.*]. She received $207,234.47 in salary, and her employers paid $16,432.49 in payroll taxes. The parties also agree that Camellia Home Health and Amedisys repaid the health care benefit programs for

3

money they had wrongfully received as a result of Defendant's fraud in the amount of $528,844.16 [*see id.*].[3] Defendant argues the amount her employers repaid the health care benefit programs (the $528,844.16) should not be included in the amount of loss. This would reduce her offense level by four levels [Doc. 30, pg. 1].

The Application Notes to U.S.S.G. § 2B1.1 provide that the amount of loss is the greater of the actual loss or intended loss. U.S.S.G. § 2B1.1 cmt. 3(A). However, the district court, in its discretion, may opt to use the actual loss amount even where the intended loss is greater. *See, e.g.*, *United States v. Triana*, 468 F.3d 308, 314 (6th Cir. 2006) (holding the defendant accountable for the actual loss to Medicare, even though the intended loss was approximately $1.1 million greater). In this case, the PSR focused on the actual loss as did the Government. Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," while intended loss is defined as "the pecuniary harm that the defendant purposely sought to inflict" and "includes intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. 3(A). The Application Notes further instruct that "[t]he court need only make a reasonable estimate of the loss." *Id.* § 2B1.1 cmt. 3(C).

Defendant first claims the repaid amounts should be excluded because "the pecuniary harm [she] purposefully sought to inflict was to obtain employment fraudulently from the listed health care providers" [Doc. 30, pg. 2]. It was not the billing. To be included as part of the loss, the pecuniary harm must be "reasonably foreseeable." U.S.S.G. § 2B1.1 cmt. 3(A). To be sure, part of her fraud was to obtain employment, and what she received as wages would properly be included in the loss calculation. But her fraud did not stop there. She knew that her employers

---

[3] In her plea agreement, Defendant agreed the amounts provided in the table are accurate but reserved the right to dispute "whether these losses are properly attributable to her under the United States Sentencing Guidelines" [Doc. 2, *Plea Agreement*, pg. 18 n.1].

4

had to bill health care benefit providers for her services *as a registered nurse* to pay her wages as a registered nurse. Her plea agreement provides that "[t]he bills [her employer submitted] sought compensation for work performed by a licensed, registered nurse and were based on descriptions of services [she] had performed and that [she] provided to her employers" [Doc. 2, *Plea Agreement*, pg. 8]. Her employers unwittingly submitted fraudulent bills to the health care benefit programs seeking payment for services to which they were not entitled because Defendant was not a registered nurse. This was not a surprise to Defendant. Her plea agreement noted that "[a]lthough [she] was not a direct beneficiary of the payments her employers received after submitting fraudulent claims, [she] knew that the forms she completed would be submitted in support of claims for reimbursement from health care benefit programs and would otherwise be used to cause payments to be made from these programs" [*Id.* at 10]. The plea agreement supports the conclusion that the billing and payment for her fraudulent services was a "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. 3(A). She acknowledged that, because of her fraud, two of her employers "refunded health care benefit programs substantial sums they had received for [her] registered nurse services" [Doc. 2, *Plea Agreement*, pg. 10]. Thus, this part of the loss was reasonably foreseeable to her and tied directly to her conduct.

Defendant argues that including the repayments in the loss calculation is inappropriate because those amounts were just "collateral consequences." She is right about that. "The collateral consequence to [her fraud] was that the health care providers [, her employers,] submitted payment for services believing she had the appropriate credentials to perform the services for patients . . . ." [Doc. 30, pg. 2]. To be sure, that is a collateral consequence, but that does not change the fact that those repayments constitute a "reasonably foreseeable pecuniary harm" occasioned by her fraud.

5

The Application Notes clarify that a harm is reasonably foreseeable where the "defendant knew or, under the circumstances, reasonably should have known, [it] was a potential result of the offense." U.S.S.G. § 2B1.1 cmt. 3(A)(iv). As noted, the guidelines define loss in terms of harm inflicted. In this case, that is easily determined because she knew her employers would seek payment for her services and those repayments were tied directly to her fraudulent conduct.

Defendant claims the facts of this case "most closely assimilate an 'Unlawful Misrepresentation Scheme' wherein [she] misrepresented herself to be a nurse qualified for the positions for which she was paid over a period of time" [Doc. 30, pg. 2-3]. Here she argues that "only the salary losses should be used to calculate loss" because U.S.S.G. § 2B1.1 cmt. 3(F)(v) specifically provides that "loss shall include the amount paid for the . . . services" [*Id.*].

U.S.S.G. § 2B1.1 cmt. 3(F)(v) provides:

> In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals . . . , loss shall include the amount paid for the . . . services . . . , with no credit provided for the value of those items or services.

Defendant argues that this limits the loss to the amount her employers paid for her services. But the loss was not just her salary and should not be limited to that.

"Courts have consistently held that in calculating loss, substitution of defendants' gain is not the preferred method because it ordinarily *underestimates* the loss." *Triana*, 468 F.3d at 323 (6th Cir. 2006) (emphasis added). In this case, Defendant knew her employer would seek payment for her fraudulent services from the health care benefit programs and that her employer would in turn pay her. The repayments represent the amounts two of her employers received as a result of Defendant's fraud.

Moreover, this section does not limit the loss to the benefit obtained by a defendant. The Government persuasively argues that this is not a rule of limitation and that Defendant is arguing

6

that the loss is limited to her gain from the fraud. While she pled guilty to wire fraud "in order to obtain employment with health care providers," she also admitted to committing health care fraud whereby she "executed a scheme to defraud any health care benefit programs" [Doc. 2, *Plea Agreement*, ¶ 3]. Thus, the offense was not limited to just obtaining employment as Defendant suggests but defrauding the health care benefit programs. Her employers, Camellia Home Health and Amedisys, paid back to those programs the amount they received as a result of Defendant's health care fraud.

Defendant next argues the services she performed were medically necessary and physician-approved and thus should not be included in the loss amount [Doc. 30, pg. 3-4]. In other words, the health care benefit providers incurred no loss because the patients who received Defendant's services needed them.[4] A similar argument was rejected by the Sixth Circuit in *United States v. Triana*, 468 F.3d 308 (6th Cir. 2006). In *Triana*, a podiatrist had been convicted of health care fraud and could no longer participate in Medicare and Medicaid programs. To get around that exclusion, he created two companies and used them "in a scheme that would enable him to participate, benefit from, and control a podiatry practice that billed Medicare." *Id.* at 311. His entities provided medical services and billed Medicare over Two Million Dollars for those services. *Id.* at 314. After Triana was again convicted of health care fraud, he argued that the loss should be zero because all the services his company provided were legitimate services to Medicare-eligible patients. *Id.* The Sixth Circuit rejected this argument, finding that it failed "to consider

---

[4] To be sure, "to calculate loss for sentencing purposes, the value of any legitimate claims, if established, must be offset against the aggregate billings." *United States v. Mehmood*, 742 F. App'x 928, 941 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 836 (2019). Defendant has not submitted any evidence of legitimate claims. In fact, nothing that she did could be legitimate because she was not a registered nurse.

7

the important fact that Triana's participation in [his company] made it ineligible for the receipt of any Medicare funds whatsoever, regardless of the services it provided." *Id.* at 321.

The same is true here. Defendant was not a registered nurse and was not eligible to provide such services. Thus, she could not bill for them and neither could her employer, "regardless of the services [Defendant] provided." *Id.* Because the Sixth Circuit did not give Triana credit for providing "services to legitimate Medicare beneficiaries," Defendant here should receive no such benefit either. *Id.* at 323.

She next questions Amedisys's motivation in repaying the health care benefit programs for her fraudulent billing [Doc. 30, pg. 4]. She seems to argue that if Amedisys had some ulterior motive in paying back the money and that had it not repaid the health care benefit programs, then the loss would be limited to her salary. Defendant's argument misses the point behind the use of the repayments. Using the repayment amount as a way of estimating the loss represents a simplified method of determining the loss caused by Defendant's fraud. Those amounts were specifically tied to Defendant's conduct. Because only two of her employers paid back the health care benefit programs, it underrepresents Defendant's total fraud. But that inures to her benefit. The Government could have expended a lot more resources and determined how much additional fraud she caused with the other employers, but it elected not to do so. And, the Court will not endeavor to determine any loss Defendant caused by way of her other employers.

Amedisys's motivation for properly repaying the amount it had received in reimbursements from the health care benefit programs as a result of Defendant's fraudulent billings is irrelevant to the loss calculation. The fact of the matter is Defendant committed health care fraud by misrepresenting her qualifications to bill for health care services. Amedisys documented the amount it received that they connected to Defendant's fraud. That is the loss. That they paid it

8

back or did not pay it back does not change the loss calculation. Notably, Defendant does not argue that Amedisys was not obligated to repay the amounts, only that the Court should look at its suspect motives and discount the loss accordingly. That argument fails to address the real issue regarding her fraudulent conduct and the loss it caused.

The Guidelines also support including the amounts repaid because those were the net amounts received from Defendant's fraud. For example, the Guidelines provide that

> [i]n a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.

U.S.S.G. § 2B1.1, cmt. 3(F)(viii). In this case, Camellia Home Health and Amedisys *received* from the health care benefit programs $506,622.41. This amount is not gross billings but only what was approved and paid. At the hearing, the Government submitted the affidavit of Amy Boles, an administrator for Camellia Home Health of East Tennessee and a licensed registered nurse. She explained Defendant was assigned to provide private-duty, in-home nursing care for a patient. Defendant submitted to Camellia her hours worked, and Camellia in turn billed TennCare for Defendant's purported nursing services. The bills submitted to TennCare based on these services totaled $63,998.40, and TennCare actually reimbursed Camellia in the amount of $41,192.16. Upon discovering Defendant was not a licensed registered nurse, Camellia wrote a check to TennCare in the amount of $41,192.16 [Government's Exhibit 1].

Amedisys repaid health care benefit programs $465,430.25.[5] Defendant suggests including this amount in the loss is not fair to her because it is "nearly 10 times her salary" [Doc. 30, pg. 4].

---

[5] While the plea agreement and the Government's exhibits list Amedisys's amount repaid to the health care benefit programs as $487,652, the Government has since filed a Notice [Doc. 62] indicating the total repayment amount should be reduced by $6,031.75. This reduction is due to

9

Again, that argument focuses on the benefit she received and not the harm that her conduct caused. That she only received a salary does not change the loss attributable to her conduct.

At the evidentiary hearing, Ms. Denise Bohnert testified about how Amedisys calculated the amount it had to repay the health care benefit programs. She is the Chief Compliance Officer for Amedisys, a registered nurse, and an attorney. The Court finds her testimony credible and supports the figures summarized in Exhibit 3.

A couple points should be noted about the size of Amedisys's loss. Amedisys included in its calculations payments it received for Defendant's services. It also included payments for services that Defendant certified as a registered nurse were necessary. For example, Bohnert testified that Medicare typically follows "episodic billing," in which the health care provider is reimbursed per 60-day "episode of care." This method is contrasted with the "pay per visit" method of health care billing, which is typically used by Medicaid and private insurers. In the home health context, Bohnert explained that the nurse who assesses the patient at the "start of care" completes an initial assessment as well as the OASIS assessment, which drives the rate received for the care for that patient. Bohnert further explained that the Medicare Benefit Policy Manual Chapter 7, which pertains specifically to home health services, contains "conditions of participation" with which the home health company must comply to bill federal payer services. The Government's Exhibit 2 is a copy of the relevant federal regulation, 42 C.F.R. § 484.55, which details the comprehensive assessment portion of the conditions of participation. Bohnert explained this is an episode-specific regulation. The regulation provides, in relevant part:

---

Amedisys's discovery that it issued a duplicate check and that one of the health care benefit programs did not cash one of their checks. Exhibit 3 from the evidentiary hearing shows Amedisys repaid $471,462.00. Thus, accounting for the revision, the total repayment by Amedisys is $465,430.25 ($471,462 less $6,031.75).

10

> A *registered nurse* must conduct an initial assessment visit to determine the immediate care and support needs of the patient; and, for Medicare patients, to determine eligibility for the Medicare home health benefit, including homebound status. The initial assessment visit must be held *either within 48 hours of referral, or within 48 hours of the patient's return home, or on the physician or allowed practitioner-ordered start of care date*.

42 C.F.R. § 484.55(a)(1) (emphasis added). Bohnert stated this is a technical requirement that must be followed in order to bill Medicare for services. Bohnert further stated that if this initial assessment is deficient, the entire 60-day episode must be "written-off," i.e., not billed. Bohnert testified that where Defendant, who was not a registered nurse, performed the initial assessment required by the regulations to be performed by a registered nurse, Amedisys was under a legal obligation to refund to Medicare the entire 60-day bill for that episode. This was true even if Defendant did not perform all the services ultimately billed for in that episode. Because the start of care was invalid, the entire 60-day episode was unbillable.

Bohnert testified that she oversaw the preparation of the Government's Exhibit 3, which is a chart that categorizes Amedisys's repayments to health care benefit programs: Medicare, PPS Private, Medicaid, and Non-Episodic. The chart divides the total repayments between "payments," amounts for which Amedisys actually wrote a check to the health care benefit program, and "write-offs," which were amounts representing bills that had not yet been finalized but would have been billed to and received from the health care benefit programs had they not realized they were for services that were unbillable due to Defendant's fraud.

The Government argues that the loss should include $481,620.25, which includes both the repayments and the write-offs.[6] Amedisys wrote off $16,190, which it never billed any health care

---

[6] This is based on $487,652 less the adjustment of $6,031.75.

11

benefit program.[7]  The problem with including the write-offs in the loss is that the write-offs represent the amount Amedisys discovered was fraudulent *before* it submitted the final bill.  It did not have to repay any health care benefit program for that amount because it never received a reimbursement for that amount.  Indeed, neither the health care benefit programs nor Amedisys were out anything of value.  Because of that, the write-offs should be excluded from the loss calculation.  This is consistent with the Government's argument that "actual losses include what Amedisys and Camellia voluntarily repaid or agreed to repay" [*Id*. at pg. 2].  Accordingly, only Amedisys's actual repayments will be included in the loss, that is, $465,430.25 ($471,462 less the $6,031.75 adjustment).  For Camellia Home Health, that figure is $41,192.16.

The parties agree Defendant's wages and payroll taxes are properly included in the loss calculation.  The Court agrees.  Amedisys and Camellia paid Defendant a salary for the work performed and they paid her from the proceeds they had billed for those fraudulent services. Including what they paid Defendant does not overstate the actual loss because Amedisys and Camellia repaid the providers *and* paid Defendant.  That is exactly what Defendant wanted to occur and was reasonably foreseeable to her.

The Court finds that the Government has satisfied its burden by proving the following loss by a preponderance of the evidence:

| Health Care Provider | Salary and Taxes | Repayments | Total |
|---|---|---|---|
| Premier Support Services | 35,521.42 | 0 | 35,521.42 |
| Jefferson Operator | 41,403.60 | 0 | 41,403.60 |
| Hillcrest Healthcare | 33,094.58 | 0 | 33,094.58 |
| Dr. Harry Zain | 12,198.65 | 0 | 12,198.65 |
| Camellia Home Health | 30,244.89 | 41,192.16 | 71,437.05 |
| Almost Family | 11,728.48 | 0 | 11,728.48 |

---

[7] The PSR and the government both advocate using actual loss versus intended loss as the best method to determine total loss under the Guidelines.  The Government notes that "[u]sing actual loss is due to the Government's agreement and the impracticality of broadening the investigation to locate potentially thousands of billings for defendant's fraudulent skilled nursing services spanning more than a decade and billing by multiple employers" [Doc. 39, pg. 7].

| Life Care Centers | 8,213.23 | 0 | 8,213.23 |
| Amedisys | 51,262.11 | 465,430.25 | 516,692.36 |
| **Total** | | | 730,289.37 |

Under the Guidelines, this merits a 14-level enhancement pursuant to § 2B1.1(b)(1)(H) based on a loss amount of more than $550,000 but less than $1,500,000. Therefore, this objection is OVERRULED.

**B.   Sophisticated Means Enhancement – Defendant's objection to ¶ 70 of the PSR**

Defendant also objected to the PSR's application in Paragraph 70 of a two-level enhancement under U.S.S.G. § 2B1.1(b)(10)(C) for use of sophisticated means [Doc. 30, pg. 5]. However, prior to the evidentiary hearing, Defendant filed a Notice [Doc. 57], withdrawing the objection. Therefore, this objection is now moot.

**C.   Criminal History Computation – Defendant's objection to ¶ 85 of the PSR**

Next, Defendant objects to the addition of two criminal history points pursuant to U.S.S.G. § 4A1.1(d) for committing the instant offense while under a criminal justice sentence [Doc. 34, pg. 1-2]. The Government has conceded this objection [Doc. 41, pg. 4 n.3], and the PSR Addendum updated the PSR to remove these two criminal history points, taking Defendant's criminal history category from II down to I [Doc. 51, pg. 5]. Therefore, this objection is now moot.

**D.   Restitution Calculation – Defendant's objection to ¶ 120 of the PSR**

Defendant also objects to the PSR's calculation of restitution, referring back to her arguments regarding the loss calculation [Doc. 30, pg. 9-10]. She also argues that "restitution should be ordered only after an inquiry is made of these health care providers to determine if they sought a refund from the IRS for the Employer-Paid Payroll Taxes" [*Id.* at pg. 10].

A district court "must base its order of restitution on actual losses." *United States v. Riddell*, 328 F. App'x 328, 329 (6th Cir. 2009) (citing *United States v. Simpson*, 538 F.3d 459, 465 (6th Cir. 2008)). "The government has the burden of proving the amount of restitution by a

13

preponderance of the evidence." *United States v. Bailey*, --- F.3d ----, No. 18-5607, 2020 WL 5201235, at *17 (6th Cir. Sept. 1, 2020). In *United States v. Patel*, the Sixth Circuit found that the district court did not err when it ordered restitution in the amount of "the total amount of bills submitted to Medicare/Medicaid" from his corporate entity. 694 F. App'x 991, 996 (6th Cir. 2017). Because the Court has found the actual loss amount includes the amounts Camellia and Amedisys repaid to the health care benefit programs, it follows that the restitution should also include these amounts, for a total restitution of $730,289.37 as identified in the chart, *supra*. Therefore, this objection is OVERRULED.

**E.      Personal and Family Data – Defendant's objections to ¶¶ 90, 98, 101, 102 of the PSR**

Defendant also objects to the photograph of her contained in the PSR, stating it should be updated with a more recent image that more accurately reflects her current image [Doc. 30, pg. 1]. She further objects to paragraphs 90, 98, 101, and 102, regarding her personal and family data, providing the Court with updates on her marital status and name change, her mental health treatment, her medical certifications, and her recent employment [*Id.* at pg. 8-9]. In the PSR Addendum, the U.S. Probation Officer attached a more recent photograph of Defendant and acknowledged the updates to her personal and family data [*see* Doc. 51, pg. 1, 3-4]. Therefore, these objections are now moot. Further, these updates do not affect Defendant's guideline range calculation.

**III.     GUIDELINE RANGE CALCULATION**

Based upon a total offense level of 24 and a criminal history category of I, Defendant's guideline imprisonment range is 51 months to 63 months.

14

## IV. CONCLUSION

Defendant's objections to the loss amount and restitution are **OVERRULED**, and her remaining objections are moot.

SO ORDERED:

s/ Clifton L. Corker
United States District Judge
